# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

JEFFERY A. VICARS,

       Plaintiff,

v.

CASE NO. 06-12725
HON. LAWRENCE P. ZATKOFF

ENVIRONMENTAL POTENTIALS, INC.,

       Defendant.

_____/

# **OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on October 9, 2007

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## **I. INTRODUCTION**

This matter is before the Court on cross-motions for Summary Judgment. *See* Dkt. #19, 20. Each party has responded to the other's motion and provided evidence in support of their respective arguments. The Court finds that the facts and legal arguments are adequately presented in the parties' papers and the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. LR 7.1(e)(2), it is hereby ORDERED that the motion be resolved on the briefs submitted. For the reasons set forth below, Defendant's motion will be GRANTED in part and DENIED in part and Plaintiff's motion will be DENIED.

## **II. BACKGROUND**

This is a breach of contract action in which Plaintiff claims that Defendant breached the parties' sales commission contract by failing to pay him post-termination commissions for certain

sales of Defendant's products. Defendant is a Nevada corporation in the business of manufacturing surge suppressors. While Defendant's ordinary practice was to install its suppressors directly into its customers' facilities, it attempted to diversify its business in early 2001 by selling its suppressors to vendors who built production machines for manufacturing companies. According to its plan, Defendant attempted to persuade manufacturers to identify its surge suppressors in their machine specifications provided to machine builders. In this way, Defendant would have access to thousands of potential customers based on securing one account with a single manufacturer. In this case American Axle and Manufacturing Co. ("American Axle") was such a manufacturer.

In order to generate manufacturing customers in Michigan, Defendant retained Plaintiff as an independent contractor. On October 5, 2001, Plaintiff entered into a written independent contractor's agreement with Defendant. Under that agreement, Plaintiff promised to use his best efforts to promote the sale of two of Defendant's product series, the EP 2000 and the 5000.[1] Both series consisted of varying models of the standard product, such as the EP 2000a, EP 2000f, and EP 2000g. In turn, Defendant promised to pay Plaintiff on a commission basis. Prior to this agreement, though, Plaintiff had put Defendant in contact with representatives of American Axle, which was interested in replacing one of its current surge suppressors with one of Defendant's products.

Aside from setting up an introductory meeting with American Axle, and attending two others, Plaintiff had little involvement in persuading American Axle to specify Defendant's products. Nevertheless, the parties executed another document that was intended to supercede the original independent contractor's agreement with respect to the American Axle account. The parties

---

[1] It appears that the reference to the 5000 series may have been in error, as all of Defendant's products start with the number two (2). Thus, it is likely that the parties actually intended to distinguish between the EP 2000 and the EP 2500.

2

agree that the subsequent agreement, executed on November 5, 2001, controls the outcome of this case. Under that agreement, Defendant promised to pay Plaintiff a seven percent commission for all EP 2000 products that American Axle specified in its plants, and that were sold based on this specification. The period of this commission was to last only for the duration of the primary specification period. However, if Plaintiff's relationship ended during the primary specification period he would still receive seven percent commissions on the products sold under the American Axle account for the remainder of that period. If Plaintiff's relationship with Defendant had not been terminated by the end of the primary specification period, his commission would be reduced to three percent if American Axle respecified any of the products it had previously specified. If American Axle chose not to respecify any products, Plaintiff's commission would end.

On May 28, 2002, following a period of intense promotion by Defendant in which it spent over $20,000 to conduct comparative tests between its product and the product American Axle was currently using, American Axle deviated from its official corporate specification and began specifying the EP 2000g on a limited basis. American Axle's reason for specifying the EP 2000g on a limited basis was to essentially conduct field tests of the EP 2000g prior to making a decision as to whether American Axle would use the product in all of its potential applications. On March 1, 2004, after nearly two years of using the EP 2000g on a limited basis, American Axle officially decided to include the EP 2000g in its corporate specifications.

On or about March 23, 2004, shortly after American Axle officially changed its specification to include the EP 2000g, Defendant terminated its relationship with Plaintiff. It is undisputed, however, that Plaintiff received a seven percent commission for all EP 2000g units sold under the American Axle account prior to his termination, and that Defendant continued paying these

3

commissions until at least June 2005. When Defendant ceased paying commissions Plaintiff filed the instant suit, claiming that Defendant breached the terms of the contract governing the American Axle account.

### III. LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Turner v. City of Taylor*, 412 F.3d 629, 637 (6th Cir. 2005). When deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A genuine issue of material fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted).

### IV. ANALYSIS

The issue before the Court is whether Plaintiff is entitled to post-termination commissions for sales of Defendant's products under its account with American Axle, when the parties' contract stated that Plaintiff would be paid a seven percent commission on all EP 2000 products specified by American Axle during the primary specification period as defined by American Axle. The relevant contractual provision provides as follows:

American Axle:

> This project will be paying you a 7% commission on all EP 2000 products that is [sic] specified in the American Axle plants worldwide. This is good for the time frame of the primary specification period. American Axle will define that duration of time. If during that period a relationship ceases to exist between Mr. Jeff

4

> Vicars [Plaintiff] and Environmental Potentials [Defendant] this commission will continue for that first specification period, then terminate. If Mr. Vicars and Environmental Potentials still continue in its [sic] relationship and the product is respecified, then the commission will change to a 3% commission until completion of the next specification period. This will remain in effect until otherwise altered in writing.

Def.'s Ex. I.

Plaintiff takes the position that the phrase "all EP 2000 products" that are "specified in the American Axle plants worldwide" includes Defendant's EP 2500 surge suppressor. Based on this interpretation, Plaintiff contends that the "primary specification period" is ongoing because American Axle's current specification includes the EP 2500 surge suppressor, and it has not decided to specify a product that did not exist when Plaintiff worked for Defendant or the product of a different company. On the other hand, Defendant argues that "all EP 2000 products" does not include its EP 2500 surge suppressor and that the "primary specification period" ended in March of 2004 when, following a two year trial period, American Axle officially decided to add the EP 2000g to its specifications. Consequently, the disposition of this case depends on whether "all EP 2000 products" can be fairly interpreted to include the EP 2500 surge suppressor and when, if at all, the primary specification period ended.

When interpreting a contract the Court must ascertain the intent of the parties as objectively expressed in the terms of the contract. *City of Grosse Pointe Park v. Michigan Mun. Liab. & Prop. Pool*, 473 Mich. 188, 197 (2005) (quoting *McIntosh v. Groomes*, 227 Mich. 215, 218 (1924)). Where the language of the contract is unambiguous, the Court must "construe and enforce the contract as written." *Quality Products & Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 375 (2003). On the contrary, if the language of the contract is ambiguous, the Court may hear evidence to explain the ambiguity. *See Grosse Pointe Park*, 473 Mich. at 198 (quoting *New Amsterdam Cas. Co. v.*

*Sokolowski*, 374 Mich. 340, 342 (1965)). "However, [the Court] will not create ambiguity where the terms of the contract are clear." *Id.* Similarly, parties to a contract are presumed to understand the plain language of the contracts they sign, and "the unilateral subjective intent of one party cannot control the terms of a contract." *Burkhardt v. Bailey*, 260 Mich. App. 636, 655-56 (2004).

A contract is ambiguous only if its language, in light of the writing as a whole and the surrounding circumstances of the parties, "may reasonably be understood in different ways." *Universal Underwriters Ins. Co. v. Kneeland*, 464 Mich. 491, 496 (2001). *See also* 11 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 30:4 at 39 (4th ed. 1999) ("A contract is ambiguous if a genuine doubt appears as to its meaning, that is if, after applying established rules of interpretation, the written instrument remains reasonably susceptible to at least two reasonable but conflicting meanings, when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement, and who is cognizant of customs, practices, usages, and terminology as generally understood in the particular trade or business.") "If the contract, although inartfully worded or clumsily arranged, fairly admits of but one interpretation, it is not ambiguous." *Meagher v. Wayne State Univ.*, 222 Mich. App. 700, 722 (1997). Finally, "attendant facts and circumstances explain the context in which the words were used and may reveal the meaning the parties intended." *Id.* at 201.

First, the Court must determine whether the phrase "all EP 2000 products" that are "specified in the American Axle plants worldwide" includes the EP 2500 surge suppressor. The Court finds that it does not. The phrase "all EP 2000 products" unambiguously refers to only the EP 2000 series of products such as the EP 2000a, 2000f, and 2000g, and does not include the EP 2500. The EP 2500 is a costlier product with different features and uses than any of the EP 2000 series. Moreover, the

parties clearly knew how to differentiate between Defendant's different product series and would have done so had they intended the contract to include the EP 2500. This is demonstrated by the language in the October 5, 2001, independent contractor's agreement where the parties clearly distinguished between "the EP 2000 and 5000 series products ...."

Plaintiff's reliance on the deposition testimony of Theodore Thibault, Defendant's CEO, for the proposition that the reference to "all EP 2000 products" includes the EP 2500 is misplaced. The quoted portions of Thibault's deposition have been taken out of context, and Plaintiff fails to recognize that Thibault clearly explained that the EP 2000 and EP 2500 were not the same product or part of the same line of products. Thus, contrary to Plaintiff's assertion, Defendant has never admitted that the EP 2000 and EP 2500 are the same product or part of the same line of products.

Additionally, the Court finds Plaintiff's arguments regarding the fact that the EP 2000 and EP 2500 were based on similar technologies and included together in price quotations and promotional materials unpersuasive. The record is clear that the EP 2000 series and EP 2500 series constituted two distinct product series with different prices, applications, and sizes, regardless of whether they shared similar technology. As Defendant aptly stated, "[a] Corvette and a Chevette also share much of the same technology and accomplish essentially the same purpose, but that does not make them the same product." Dkt. #19 at 12. The same is true even though Defendant provided price quotes for and information on each product in the same documents. These documents show nothing more than the fact that Defendant manufactured and sold each product, and do not indicate that Defendant treated the EP 2000 and EP 2500 as the same product in its general business, much less than in its contract with Plaintiff. Consequently, "all EP 2000 products" does not include the EP 2500 surge suppressor, and Plaintiff is only entitled to commissions for sales of the EP 2000g,

the only EP 2000 product American Axle specified.

Having determined that Plaintiff is only entitled to commissions under the contract for sales of the EP 2000g, the remaining issue concerns the time period for which Plaintiff is entitled to commissions, which turns on the boundaries of the "primary specification period." Plaintiff contends that the period is ongoing because American Axle has not stopped specifying a product that existed when he worked for Defendant in favor of a new product. Defendant argues that the "primary specification period" ended in March of 2004 when American Axle officially included the EP 2000g in its specifications. As set forth below, the Court agrees with Defendant.

The Court finds that the contract's reference to the "primary specification period" means the first period of time that American Axle specified the EP 2000g. Ordinarily, the word "primary" describes something that occurs first in a sequence of events or first in time. *See* Webster's New International Dictionary of the English Language Unabridged 1800 (3d ed. 1971). In this context, "primary" modifies "specification period," indicating that the parties contemplated a sequence of separate specification periods. This is consistent with the parties' clear reference to subsequent periods of respecification and the explicit statement that Plaintiff would receive a seven percent commission only during "that *first* specification period ...." Def.'s Ex. I (emphasis added). Therefore, the plain language of the contract demonstrates that the parties intended that Plaintiff would receive a seven percent commission for the duration of the first period of time that American Axle specified the EP 2000g. The precise boundaries of that period of time were to be defined by American Axle. There is no dispute that this specification period began in May of 2002 when American Axle made the decision to begin using the EP 2000g on a limited basis. The dispute is when this period ended.

8

As stated above, Plaintiff submits that the primary specification period is still continuing, whereas Defendant argues that it ended in March of 2004. In support of his position, Plaintiff points to his deposition testimony and declarations stating that at the time of contract, he understood that the primary specification period was to continue until American Axle changed its specification from the EP 2000g to a product from another supplier or one of Defendant's products that was not in existence in 2002. Beyond Plaintiff's subjective understanding, however, he has not produced any other evidence indicating that this was the meaning the parties intended. *See*, *e.g.*, *Rowe v. Montgomery Ward & Co.*, 437 Mich. 627 (1991) (recognizing that the intent of contracting parties is to be determined by an objective standard); *Burkhardt*, 260 Mich. App. at 655-56 (stating that "the unilateral subjective intent of one party cannot control the terms of a contract"). Thus, at the time the contract was formed, Defendant would have had no reason to understand the words "primary specification period" in this way.

Furthermore, Plaintiff's construction of the contract is based on his erroneous assertion that "all EP 2000 products" includes the EP 2500 surge suppressor and nullifies the provisions regarding his commission upon respecification. If Plaintiff's reading of the contract were correct, there could never be a period of respecification: the primary specification period could only end if American Axle chose to specify a product from a different company or specify one of Defendant's products that did not exist in 2002 and that American Axle had not previously specified, in which case Plaintiff admittedly would not be entitled to any commissions. Thus, Plaintiff completely reads the phrases "*first specification period*," "*next specification period*," and "*re-specification*" out of the contract. Moreover, it is irrelevant that American Axle did not understand or use the term "primary specification period"; whether American Axle knew what that term meant has no bearing on how

9

the parties understood the term in their contract. Lastly, while Plaintiff is correct in his assertion that it is immaterial when American Axle actually published its specification manual, he fails to recognize the significance of American Axle's actual decision to include the EP 2000g in its corporate specifications in this case. It is American Axle's decision to officially incorporate the product into its corporate specifications, not necessarily the publication in a formal manual, that matters here. In short, Plaintiff's construction finds no support in the record, and the Court concludes that the "primary specification period" is not still continuing.

In contrast, Defendant's contention that the primary specification period ended in March of 2004 is supported by the record and complies with the unambiguous language of the contract, thereby effectuating the parties' intent. The parties did not define the duration of this period but left that task to American Axle. In doing so, the parties intended for the primary specification period to be flexible: it could be as long or as short as American Axle determined. Therefore, the length of the primary specification period can be determined by simply examining American Axle's specification decisions regarding the EP 2000g. The Court finds that there is no genuine issue of material fact that the primary specification period ended no later than March 1, 2004.

The record clearly shows that American Axle initially specified the EP 2000g in May of 2002 in order to conduct field tests of the product. In other words, this initial specification was meant to test the EP 2000g on a limited basis and would precede any decision by American Axle to require the product in all machinery. Once this testing period ended, American Axle would either decide not to use the EP 2000g or decide to officially incorporate the EP 2000g in its corporate specifications. Thus the period of time in which American Axle tested the EP 2000g on a limited basis was the primary specification period: it was the earliest stage of specification that preceded

any other periods of specification, and all other decisions on American Axle's part derived from the EP 2000g's performance during this period. The evidence is undisputed that the testing period ended no later than March 1, 2004, when American Axle officially decided to incorporate the EP 2000g into its corporate specifications. Therefore, the Court finds that the primary specification period ran from May 2002 to March 1, 2004.

This construction is consistent with the purpose of sales commission contracts in general and the parties' purpose in providing for a decrease in Plaintiff's commission after the primary specification period. *See Grosse Pointe Park*, 473 Mich. at 200-201 (quoting *W. O. Barnes Co., Inc. v. Folsinski*, 337 Mich. 370, 376-77 (1953)) (stating that when "construing [contractual provisions] due regard must be had to the purpose sought to be accomplished by the parties as indicated by the language used, read in the light of the attendant facts and circumstances"). The Court finds the following description of the underlying purpose of sales commission contracts by the Michigan Court of Appeals instructive:

> It is apparent that in this kind of work, sales and service often merge. Once an account is procured, it does not remain static as first brought in, but instead, the specific services and volumes of business will change over time. Initial procurement is but one objective of the salesperson; servicing the account–which will typically involve additional sales work–is another. Not only might an existing account, through the efforts of the sales person servicing the account, come to include new services or increased volumes of business not on the table with the initial procurement of the account, but simply retaining an account under the original terms will itself often involve a significant measure of continuing salesmanship.

*Leger v. Image Data Services*, No. 221615, 2002 WL 1463555, at * 4 (Mich. App. July 5, 2002).

It is clear in this case, as the court described in *Leger*, that Plaintiff's commission was directly tied to some level of sales effort. The initial independent contractor's agreement between the parties stated that Plaintiff was not Defendant's employee, and that "[a]ny compensation that

11

[Plaintiff] would receive would be a direct result of [Plaintiff's] efforts in the sales of his wares." Def.'s Ex. C at 1. Furthermore, Plaintiff was required to "use his ... best efforts to adequately promote the sales and services of the Products offered by [Defendant] on a continuing basis and in adherence with good business practices ...." *Id.* at 2-3. The November 2001 agreement did not change Plaintiff's responsibilities but merely specified how Plaintiff would be compensated for sales on the American Axle account. That agreement dealt with "commissions on sales of up coming [sic] projects that [Plaintiff] ha[d] contributed to or generated," specifically referring to the American Axle account. Def.'s Ex. I. Therefore, by the express terms of the contract, Plaintiff's compensation was directly related to the level of sales effort he put forth.

Consistent with this relationship, the parties contemplated that Plaintiff's commission with respect to the American Axle account would decrease in conjunction with the level of salesmanship required to service the account. The most work would have naturally occurred during the primary specification period where Plaintiff's commission would be seven percent. During this period, Defendant was attempting to convince American Axle that its products were superior to the alternatives. This included working closely with American Axle to ensure Defendant's products were properly installed in machines and functioning properly. In fact, Defendant spent over $20,000 on independent comparative testing as part of this sales effort. As the court in *Leger* recognized, not only did this period require a sales effort with respect to the product, but also with respect to the level of service and customer relations Defendant could provide. Defendant was not just selling a product, but selling itself to American Axle in order to procure future business and a long term relationship.

In contrast, once the primary specification period ended, the amount of salesmanship

12

required on the account would decrease because either American Axle had decided not to respecify Defendant's product, in which case no work would be required on the account, or American Axle had decided to include Defendant's product in its specification manual, in which case Defendant would simply have to maintain a working relationship with American Axle. Once American Axle respecified a product, it did not need to be convinced of that product's quality to the same extent it did during the period of limited field testing. In fact, Plaintiff related the decrease in commission to the "[d]eclining value of [his] services." Pl.'s Dep. at 54 (explaining that he would "help them [Defendant] get into the account, help them initially move it along, but after that I'm not providing this tremendous function so you don't deserve as much compensation").

Since the contract limits Plaintiff's entitlement to commissions to sales of the EP 2000g during the first period of time that American Axle used it in its specifications, the Court must enforce the contract according to its terms and consistent with the parties' intent. *See Quality Products*, 469 Mich. at 375 (stating that where the language of the contract is unambiguous, the Court must "construe and enforce the contract as written"). The record shows that Defendant paid Plaintiff a seven percent commission for all sales related to American Axle through June 2005, well after the primary specification period ended. Plaintiff has not come forward with any evidence to the contrary. Thus, the Court finds that Plaintiff has received all of the commissions he is entitled to under the parties' contract for the primary specification period.

However, the Court finds that the resolution of these issues does not dispose of this case. There is no dispute that Plaintiff's relationship with Defendant ended on or about March 23, 2004, which, based on the Court's findings, is outside of the primary specification period. Consequently, by the terms of the parties' contract, Plaintiff would have then been entitled to three percent

13

commissions for sales of the EP 2000g for the duration of the respecification period. Neither party has presented evidence bearing on these issues and, therefore, questions of fact remain that preclude the Court from granting summary judgment as to the case as a whole. As a result, the Court will grant summary judgment for Defendant to the extent that there is no genuine issue of fact that the primary specification period ended on March 1, 2004, and that Plaintiff received seven percent commissions for all sales of the EP 2000g through June 2005. Defendant's motion will be denied to the extent that issues of fact remain as to when the respecification period for the EP 2000g ended and whether Plaintiff received his three percent commission for sales of the EP 2000g related to the American Axle account during the respecification period. On the other hand, Plaintiff has clearly not met his burden to show the absence of a material issue of fact warranting summary judgment in his favor, and, therefore, Plaintiff's motion will be denied.

## V. CONCLUSION

Based on the foregoing analysis,

IT IS ORDERED that Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part and Plaintiff's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

s/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated: October 9, 2007

CERTIFICATE OF SERVICE

      The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on October 9, 2007.

                                                  s/Marie E. Verlinde
                                                  Case Manager
                                                  (810) 984-3290